**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION AT DAYTON**

| | | |
|---|---|---|
| CHRISTINA MAY, | : | Case No. 3:19-cv-00047 |
| Plaintiff, | : | District Judge Walter H. Rice |
| | : | Magistrate Judge Sharon L. Ovington |
| vs. | : | |
| COMMISSIONER OF THE SOCIAL SECURITY ADMINISTRATION, | : | |
| Defendant. | : | |

# REPORT AND RECOMMENDATIONS[1]

## I. Introduction

Plaintiff Christina May is a longtime sufferer of pain—including back and neck pain—and other significant health problems. She brings this case challenging the Social Security Administration's denial of her applications for Disability Insurance Income and Supplemental Security Income. The denial mainly occurred in Administrative Law Judge (ALJ) Gregory G. Kenyon's decision that Plaintiff was not under a benefits-qualifying disability.

Plaintiff seeks a remand of this case for payment of benefits or, at a minimum, for further proceedings. The Commissioner asks the Court to affirm ALJ Kenyon's decision.

## II. BACKGROUND

Plaintiff asserts that she has been under a disability starting on February 26, 2015.

---
[1] Attached is a NOTICE to the parties regarding objections to this Report and Recommendations.

She was age 39 on that date and is therefore an "younger person" under Social Security Regulations. 20 C.F.R. §§ 404.1563(c), 416.963(c)).[1] Plaintiff completed the eleventh grade in high school, and her past relevant work was as a janitorial supervisor, housekeeper, restaurant manager, and dietary aid.

Plaintiff testified during the administrative hearing held by ALJ Kenyon that she suffers from lumbar degenerative disc disease at L5-S1. ALJ Kenyon asked her about her herniated disc at L5-A1. *Id.* at 87. Plaintiff described her low-back pain as throbbing and constant aching. She estimated her pain level at 8 on a 0-10 scale (10 equaling the highest pain level). Plaintiff also has pain in her right leg, and her right foot goes "numb, like asleep." *Id.* at 88. Her right leg gives out about once a month. She also has pain in her shoulders, arms, thighs, hips, and upper chest. She described this pain as "achy." *Id*. at 91. On days when her legs, neck, and back pain flares up, her pain level can reach 10 on the 10-point scale. *Id*. at 92. Plaintiff testified about feeling achy from fibromyalgia. She rated her fibromyalgia pain as 8 on the 10-point scale. *Id.* at 91.

Plaintiff has neck pain that is sharp, throbbing, and constant. *Id*. at 98. She estimated at neck-pain level as 8 on the 10-point scale. She indicated that she has a bone spur in her neck, causing her to get headaches. *Id*. at 99.

Plaintiff estimated that she could lift about 10 pounds and stand or sit for about 30 minutes. *Id.* at 96. She cannot walk on concrete. *Id.* at 89, 96. She used to be able to

---

[1]The remaining citations to the Social Security Administration's Regulations will identify the pertinent Disability Insurance Benefits Regulation with full knowledge of the corresponding Supplemental Security Income Regulations.

2

clean the house but could no longer do so—she can't vacuum or mop. She could ride a bicycle in the past but could not do so anymore. *Id*. at 89. She has difficulty bending at the waist, making it hard for her to pick up things.

Plaintiff also experiences depression. She has crying spells and trouble concentrating and remembering names and dates. *Id*. at 94. She can "literally have [her] keys in [her] hands and be looking for them…." *Id*. at 92. She gets moody, angry, sad, unhappy, and she cries. *Id*. at 94. She is also irritable. She can sometimes be happy but small things can set her "off in the wrong way." *Id*.

She has trouble interacting with people and feels very uncomfortable around others. This causes her to feel "panicky, closed in." *Id*. She explains, 'I've actually gotten into arguments with more than one person." *Id.* When asked if she has trouble going to places where there are other people, she replied, "I sometimes do… probably about maybe once every couple of months." *Id.* at 95. She has crying spells about 5 times a month.

Plaintiff is married with 2 older children. *Id*. at 85. She has a driver's license. *Id.* at 86. She sleeps 5-6 hours per night. *Id.* at 96. She is able to wash and dress herself. *Id.* at 89. She can cook but sits near the stove to watch it. *Id.* at 97. She spends her ordinary day watching a lot of television, doing the dishes, and preparing dinner. When she does the dishes, she needs to take breaks before finishing.

Plaintiff testified that she is 95 percent deaf in her right ear. *Id*. at 101.

### III. "Disability" and The ALJ's Decision

To be eligible for Disability Insurance Benefits or Supplemental Security Income

3

a claimant must be under a "disability" as defined by the Social Security Act. *See* 42 U.S.C. §§ 423(a), (d), 1382c(a). The definition of the term "disability" is essentially the same for both programs. *See Bowen v. City of New York*, 476 U.S. 467, 469-70 (1986). Narrowed to its statutory meaning, a "disability" includes only physical or mental impairments that are both "medically determinable" and severe enough to prevent the applicant from (1) performing his or her past job and (2) engaging in "substantial gainful activity" that is available in the regional or national economies. *See id.* at 469-70.

As noted previously, it fell to ALJ Kenyon to evaluate the evidence. He did so by conducting the 5-step sequential evaluation mandated by Social Security regulations, 20 C.F.R. § 404.1520(a)(4). His significant findings for present purposes began at step 2, where he found that Plaintiff had the severe impairments—lumbosacral degenerative disc disease, cervical degenerative disc disease, fibromyalgia, bipolar disorder, depression, and anxiety. (Doc. #6, *PageID* #s 61-64). He next found, at step 3, that Plaintiff was not decisively eligible for benefits. *Id.* at 64-66.

At step 4, ALJ Kenyon concluded that Plaintiff had the residual functional capacity, or the most she could do in a work setting despite her impairments, *see Howard v. Comm'r of Soc. Sec.*, 276 F.3d 235, 239 (6th Cir. 2002), to do "sedentary work . . . except (1) occasional crouching, crawling, kneeling, stooping, balancing, and climbing of ramps and stairs; (2) no climbing of ladders, ropes, and scaffolds; (3) no work around hazards such as unprotect heights or dangerous machinery; (4) limited to performing unskilled, simple, repetitive tasks; (5) occasional contact with co-workers and supervisors; (6) no public contact; (7) no fast paced production work or strict production

4

quota; and (8) limited to performing jobs which involve very little, if any, change in the job duties or the work routine from one day to the next. *Id*. at 66. The ALJ also concluded at step 4 that Plaintiff could no longer perform her past relevant work. *Id*. at 69-70.

The ALJ determined at step 5 that Plaintiff could perform many jobs (dowel inspector, final assembler, weight tester) that exist in the national economy. This, in turn, meant that Plaintiff was not under a disability and not eligible for Disability Insurance Benefits and Supplemental Security Income. *Id*. at 70-71.

## IV. Judicial Review

The Social Security Administration's denial of Plaintiff's applications for benefits—embodied in ALJ Kenyon's decision—is subject to judicial review along two lines: whether he applied the correct legal standards and whether substantial evidence supports his findings. *Blakley v. Comm'r of Social Sec.*, 581 F.3d 399, 405 (6th Cir. 2009); *see Bowen v. Comm'r of Social Sec.*, 478 F3d 742, 745-46 (6th Cir. 2007). Reviewing the ALJ's legal criteria for correctness may result in reversal even if the record contains substantial evidence supporting his findings. *Rabbers v. Comm'r of Social Sec.*, 582 F.3d 647, 651 (6th Cir. 2009); *see Bowen*, 478 F3d at 746.

The substantial-evidence review does not ask whether the Court agrees or disagrees with the ALJ's factual findings or whether the administrative record contains evidence contrary to those factual findings. *Rogers v. Comm'r of Social Sec.*, 486 F.3d 234, 241 (6th Cir. 2007); *see Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999). Instead, substantial evidence supports the ALJ's factual findings when a

"'reasonable mind might accept the relevant evidence as adequate to support a conclusion.'" *Blakley*, 581 F.3d at 406 (quoting *Warner v. Comm'r of Social Sec.*, 375 F.3d 387, 390 (6th Cir. 2004)). Substantial evidence consists of "more than a scintilla of evidence but less than a preponderance..." *Rogers*, 486 F.3d at 241.

V. **Discussion**

A. <u>**Plaintiff's Bilateral Lower-Extremity Edema**</u>

Plaintiff contends that the ALJ erred at step 2 of his sequential evaluation by failing to conclude that the edema—swelling—she has in both her lower extremities constitutes a severe impairment. Plaintiff points out that the edema in both her lower extremities is repeatedly documented in the records, particularly in Exhibit 20F throughout 2016 and 2017. Plaintiff acknowledges that, in general, an ALJ does not err at step 2 by omitting a specific severe impairment as long as he or she finds at least one severe impairment and proceeds with the sequential evaluation. Plaintiff argues that this generality does not apply here even though ALJ Kenyon continued past step 2 of the sequential evaluation because he made no mention of Plaintiff's edema anywhere in his written decision.

An impairment is considered "severe" at step 2 of the sequential evaluation "if it significantly limits an individual's physical or mental abilities to do basic work activities …." Soc. Sec. R. 96-3p, 1996 WL 374181, at *2 (July 2, 1996); *see* 20 C.F.R. § 404.1520(a)(4)(ii). The severity requirement permits the Administration "to screen out claims that are 'totally groundless' solely from a medical standpoint." *Higgs v. Bowen,* 880 F.2d 860, 863 (6th Cir. 1988) (citation omitted). "Severity," therefore, presents a "*de*

6

*minimis* hurdle": "[A]n impairment can be considered not severe only if it is a slight abnormality that minimally affects work ability regardless of age, education, and experience." *Id*. at 862 (citation omitted).

In the present case, ALJ Kenyon did not find at step 2 that Plaintiff's bilateral lower-extremity edema constituted a severe impairment and he did not mention this impairment at step 3 or 4 of his sequential evaluation. This is not reversible error in the present case because the medical records documenting Plaintiff's bilateral lower-extremity edema say very little. This problem is listed among Plaintiff's diagnoses on many occasions in 2016. But a mere diagnosis of this problem says nothing about its severity. *See Higgs*, 880 F.2d at 863. The most these records reveal is that Plaintiff had tenderness and limited range of motion, while at the same time frequently noting that Plaintiff had normal motor strength and tone, and normal gait and station. *See* Doc. #6, *PageID* #s, 1232, 1235, 1238, 1240-41, 1243, 12461250, 1253 ("no swelling in the extremities"), 1254, 1256 ("no swelling in the extremities"), 1257-58, 1262. An exception to this appeared in a note on February 2016 stating "edema; +2 edema" *Id*. at 1264. But this isolated note is not accompanied by similarly specific indications of swelling in the months that followed or by treatment information suggesting more than a slight abnormality that minimally affected Plaintiff's work ability.

Plaintiff relies on a treatment note in May 2017 when Suresh Gupta, M.D., documented that Plaintiff had swelling and pitting edema in both her legs. *Id*. at 1196. But her next treatment records in June 2017 note only musculoskeletal tenderness with "normal movement of all extremities," normal motor strength and tone, normal gait and

station, and no diagnosis of peripheral edema. *Id*. at 1191. Plaintiff also relies on her subjective reports during 2017 of swelling in her extremities. Her reports, however, were not confirmed with diagnoses of peripheral swelling and were accompanied by normal musculoskeletal findings, and normal gait and station. *See id*. at 1175, 1185, 1191, 1195, 1198.

Plaintiff further points to records from her emergency-room visit in January 2016. She arrived at the emergency room "ambulatory with [complaints of] high BP and leg swelling." *Id*.at 714. She further reported that her leg swelling had been happening for 3 days. Examination revealed "mild dependent edema in the bilateral lower extremities. At worst this is 1+ edema with minimal pitting. No calf tenderness or palpable cords." *Id*. at 725. She was prescribed a short course of Lasix to assist with her lower-leg edema. Plaintiff emphasizes that Harold W. Guadalupe, M.D., advised her to elevate her legs at least once or twice a day. *Id*. She was "discharged home in good condition with instructions to follow-up with her primary care physician for re-evaluation…." *Id*. Contrary to Plaintiff's contentions, this information is not meaningfully probative of whether Plaintiff's lower-leg swelling was more than an abnormality than a slight abnormality that minimally affected Plaintiff's work ability.

Even if the ALJ erred at step 2, or thereafter, by not considering whether Plaintiff's bilateral lower-extremity edema limited her residual functional capacity, the error was harmless. None of Plaintiff's physicians opined that her lower-extremity edema limits her work abilities. This is unsurprising given that her treatment records contain minimal objective findings beyond mere diagnoses of this condition. Plaintiff,

8

moreover, does not point to medical evidence upon which a reasonable inference could arise that she had such limitations over the course of one year.

Accordingly, Plaintiff's challenges to the ALJ's decision at step 2, and thereafter, concerning her bilateral lower-extremity edema lack merit.

**B.** **Plaintiff's Remaining Arguments**

Plaintiff argues that the ALJ reversibly erred when evaluating the medical record and Plaintiff's residual functional capacity, and by failing to carry the step 5 burden. Plaintiff asserts that the ALJ failed to consider her pain-management records throughout 2016 and 2017 concerning her low-back pain and other symptoms. She emphasizes that the ALJ ignored the following progress note by Naomi Sandar, D.O.:

> Review of patient's CT scan of lumbar spine in 2/2015 and her recent lumbar MRI 12/2016 ordered by Dr. Gupta and her worsening low back pain and lumbar claudication symptoms seem to warrant opinion from spine specialist. Since 2008 at time of injury, she has done PT 4 different times with little to no improvement. She has failed acupuncture and spinal epidural injections x 3. Will continue with current pain management but will go to get opinion from spine surgeon (Dr. Nicolas Grisoni) to see if there may be any other options for her back pain other than continued opioids…. Pt agreeable to plan.

(Doc. #6, *PageID* #993).

Although this progress note establishes that Dr. Sandar thought Plaintiff needed to consult with a spine specialist, Dr. Sander did not offer an opinion about whether Plaintiff's low-back pain or other symptoms caused her any significant work limitations. Similarly, the administrative record does not contain a treating, consulting, or one-time examining physician's opinion about Plaintiff's work limitations. As a result, the ALJ did not err by not specifically discussing Dr. Sandar's progress note particularly when the

9

ALJ recognized that Plaintiff had a history of degenerative disc disease as shown by the February 2015 CT scan that Dr. Sandar referenced. *See* Doc. #6, *PageID* #69; *cf. Bass v. McMahon*, 499 F.3d 506, 510 (6th Cir. 2007) ("Since Dr. Naum made no medical judgments, the ALJ had no duty to give such observations controlling weight or provide good reasons for not doing so."). Additionally, Dr. Sandor's treatment notes from January 2017—a month before she concluded that Plaintiff should see a spine specialist—state that Plaintiff was "[n]egative for back pain." (Doc. #6, *PageID* #988). In May 2017, three months after her conclusion, Dr. Sandor's treatment notes again indicate that Plaintiff was "[n]egative for back pain." *Id*. at 998. She again had no back pain in June 2017. *Id*. at 1002.

The ALJ observed that the CT scan performed in February 2105 showed disc herniation at L5-S1, but "there was no signal evidence of any nerve root compression on that study or any other neurological involvement…." (Doc. #6, *PageID* #69). A review of the CT scan performed in February 2015 confirms the accuracy of the ALJ's observation. *See id*. at 351.

The ALJ also accepted that Plaintiff's "pain complaints are partially supported by the record. *Id*. at 69. The ALJ, however, recognized, "neither the level of treatment she has received nor the degree of disc degeneration in either her LS or cervical spine are indicative of an inability to perform 'sedentary' level of work." *Id*. Not only do Dr. Sandor's no-back-pain notes support these findings, but other substantial evidence supports. This includes the clinical evidence described above, *supra*, §V(A), and additional medical evidence concerning Plaintiff's back health that show mostly normal

or mild abnormal findings along with diagnoses of lumbar sprain or strain, and "displacement of lumbar intervertebral disc without myelopathy," meaning without compression of the spinal cord.[2] *See* Doc. #6, *PageID* #s 456, 461, 509, 1175, 1179, 1185, 1188, 1191, 1196, 1199, 1202, 1205, 1208 ("discogenic disease at L5-S1, slightly progressed"), 1232, 1235, 1238, 1241, 1243, 1246, 1250, 1253-54, 1257-58, 1261-62, 1267, 1270, 1273-74.

Plaintiff next challenges the mental-work limitations the ALJ set based on the opinions provided by record reviewers Courtney Zeune, Psy.D., and Patricia Kirwin, Ph.D.

The ALJ recognized that these psychologists found Plaintiff "was limited to having superficial social contacts in a less than public setting." *Id*. at 64; *see id*. at 145. The ALJ then explained:

> The term "superficial social contacts" [is] not defined by the DOT whereas occasional is defined. The above restrictions [sic] for simple repetitive tasks with no more than occasional contact with co-worker and supervisors, and no public contact, when considered together, are sufficient to ensure that any social contact the claimant would be compelled to have as part of the claimant's actual job duties would be sufficiently superficial.

*Id*. at 64.

Plaintiff points out that "occasional" and "superficial" are not coterminous. She argues, "In finding [her] not disabled, the ALJ relied on responses to hypotheticals he posed to the vocational expert that only limited Plaintiff to 'occasional contact' with

---

[2] "Myelopathy is the clinical scenario of spinal cord compression causing (upper motor neuron – UMN) neurologic dysfunction such as gait disturbance (trouble walking), pathologic reflexes (increased reflexes and spasticity), muscle weakness, and/or numbness (sensory deficits)…." https://www.uscspine.com/conditions-treated/neck-disorders/spinal-stenosis-myelopathy/

11

others.  Therefore, the ALJ failed to meet his burden at Step Five because it cannot be discerned whether the additional limitation—to 'superficial contact'—would preclude substantial gainful employment in the national economy." (Doc. #7, *PageID* #1286).

Plaintiff's contentions lack merit because the ALJ acknowledged and sufficiently accounted for the difference between "occasional" and "superficial" contacts.  He explained that he did not use the term "superficial" contact because the DOT does not define it.  He then went beyond finding Plaintiff limited to occasional contact with coworkers by including the more restrictive finding that Plaintiff could not engage with the general public.  It was then reasonable for the ALJ to take the combination of these limitations to constitute a "sufficiently superficial" limitation.  In this manner, moreover, he found Plaintiff more restricted than Drs. Zeune and Kirwin, who each thought Plaintiff had a "moderate" limitation in her ability to interact appropriately with the general public.  (Doc. #6, *PageID* #s 117, 145).  Additionally, the ALJ did not err at step 5 of his sequential evaluation because he asked the vocational expert about jobs available to a hypothetical person with Plaintiff's work limitations—including occasional contact with coworkers and supervisors, and no contact with the general public.  *Id*. at 104-05; *see Smith v. Halter*, 307 F.3d 377, 378 (6th Cir. 2001) ("A vocational expert's testimony concerning the availability of suitable work may constitute substantial evidence where the testimony is elicited in response to a hypothetical question that accurately sets forth the plaintiff's physical and mental impairments.").

**IT IS THEREFORE RECOMMENDED THAT**:

1. The ALJ's decision on March 18, 2018 be affirmed; and

2. The case be terminated on the docket of the Court.

January 9, 2020

*s/Sharon L. Ovington*
Sharon L. Ovington
United States Magistrate Judge

## NOTICE REGARDING OBJECTIONS

Pursuant to Fed. R. Civ. P. 72(b), any party may serve and file specific, written objections to the proposed findings and recommendations within **FOURTEEN** days after being served with this Report and Recommendations. Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections. If the Report and Recommendation is based in whole or in part upon matters occurring of record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs. A party may respond to another party's objections within **FOURTEEN** days after being served with a copy thereof.

Failure to make objections in accordance with this procedure may forfeit rights on appeal. *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947, 949-50 (6th Cir. 1981).